IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CANTALOUPE, INC., | : | |
| *Plaintiff* | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| AXIS INSURANCE COMPANY, | : | No. 22-030 |
| *Defendant* | : | |

## MEMORANDUM

PRATTER, J.                                                                                                  NOVEMBER 28, 2023

      Cantaloupe, a payment technology company, faced an impending financial mishap in September 2018 when the company filed an 8-K informing investors of an investigation of the company's revenue reporting. Lawsuits against the company and its officials cropped up immediately. Cantaloupe had purchased a Directors & Officers ("D&O") insurance policy from Axis Insurance that contained a Prior Knowledge Exception provision (effective July 27, 2018), approximately two months before the melon-choly times that Cantaloupe now faced. Prior to July 27, 2018, Cantaloupe officials knew that an investigation was ongoing, but it was unclear whether they had subjective knowledge of the extent of the investigation. Because there is a genuine dispute over whether one of Cantaloupe's officials had subjective knowledge that an event like the 8-K filing would occur, the Court is satisfied that granting Axis's Motion for Summary Judgment would not be fruitful at this stage of the litigation. However, there is no evidence that Axis acted in bad faith or breached the implied covenant of good faith and fair dealing because the company kept spinning on its axis to diligently investigate the matter. In sum, Axis cannot evade the lawsuit

entirely because the Court denies Axis's Motion for Summary Judgment in part and grants it in part.

## BACKGROUND

Cantaloupe, formerly known as USA Technologies, is an electronic payment technology company that focuses on the self-serve retail market. On May 8, 2018, Cantaloupe's Executive Vice President of Sales, Tom Jones, wrote an email to Cantaloupe's CFO, Priyanka Singh, and Controller, Patrick Mundy, stating that he would not sign off on the company's Q3 financial statement certification. He wrote that he believed "there could be some revenue and/or income misrepresented in the USAT [Cantaloupe] Financial Statements." CFO Singh and Controller Mundy reviewed these items, performed a SAB 99 analysis pertaining to the Sarbanes-Oxley Act, and determined that the flagged issues were not material to reporting "at the time." Mr. Jones, however, responded that he was "still not comfortable" signing the Q3 certification form after speaking with the CFO and Controller and that he was "just trying to do the right thing for our company, shareholders, and [Mr. Jones's] family." On May 9th, CFO Singh sent a text to CEO Steve Herbert that CFO Singh "started exploring UsC a little to see what it would mean [t]o restate 2017 if needed." Shortly thereafter, in late May 2018, Cantaloupe proceeded with a supplemental public stock offering that resulted in approximately $70 million gross proceeds to the company.

On June 29, 2018, Mr. Jones emailed CEO Herbert and stated that he had been "effectively remove[d]" from his employment position. In his email, Mr. Jones stated that he believed the reason was because of CEO Herbert's "drastic loss of confidence in [his] work . . . in response to [Mr. Jones's] refusal to sign the Q3 10Q Disclosure on May 9th."

In response to Mr. Jones's email, Doug Lurio, Cantaloupe's outside General Counsel, was authorized to conduct a formal investigation of Mr. Jones's retaliation claim. The investigation expanded into evaluating the actual claims that Mr. Jones made regarding various concerns about

Cantaloupe's revenue reporting and financial statements. CFO Singh and Controller Mundy expressed their worries that Mr. Lurio could not adequately conduct that investigation. CFO Singh testified that, by July 12, there were "red flags that we were noticing in the company[,] and we wanted to have expert advice should the need present itself." When asked about that "need," CFO Singh testified that it was "to ensure that . . . as the company was going through its internal investigation, ensuring that the company was being thorough, using the right experts and looking at all facts and circumstances before making any conclusions." CFO Singh then testified that she contacted an attorney with expertise in SEC matters, though it is disputed whether she actually *retained* SEC counsel.

On July 16, CFO Singh and Controller Mundy requested a confidential meeting with Cantaloupe's auditor, RSM, and Pricewaterhouse Coopers ("PWC") in advance of a meeting between senior management and RSM. At this time, CFO Singh and Controller Mundy met with Mr. Lurio, along with Robert Metzger, the Chair of the Audit Committee, and Jim Pollock, a representative of PWC. The content of that discussion is disputed. One day later, Mr. Pollock sent a follow-up email stating that "many companies also elect to pursue formal, externally-led or supplemented investigations which can entail forensic interviews, e-mail searches, etc. Often times, the perspective of how a potential regulator might view the company's responsiveness is considered here particularly when considering Dodd-Frank whistle-blower requirements." Mr. Metzger then responded, adding CEO Herbert to the email chain, that he was in favor of doing a formal investigation and that he "would also like to get the rest of the Audit Committee in the loop" because he thought it was "important to have full transparency with all constituencies."

CFO Singh testified that, on July 19, she overheard CEO Herbert "talking about potentially terminating [her] employment with a few others within the company because of [her] push towards

3

the investigation." CFO Singh and Controller Mundy then texted each other, and CFO Singh asked Controller Mundy if it was enough to go to the Audit Committee about CEO Herbert, to which Controller Mundy later stated "[i]t's fraud for 3 deals on the same day from his direct report" and CFO Singh responded "[s]o incompetent or fraud" and "[s]ame day, quarter after quarter." At this time, CFO Singh and Controller Mundy did not go to the Audit Committee because, as CFO Singh testified, they "wanted to see how the . . . internal investigation proceeded."

At the same time, Cantaloupe retained an insurance broker, Willis Towers Watson ("Willis"), to advise the company on what Directors and Officers ("D&O") and other similar types of insurance coverages to purchase. Willis recommended that the company purchase $35 million in D&O insurance, $20 million more coverage than Cantaloupe had at the time. Axis agreed and issued $5 million in excess coverage to be added to the $15 million in underlying insurance. Cantaloupe did not agree to stricter terms initially demanded by Axis, leading Axis to instead include an inverted warranty, or prior knowledge exclusion ("PKE"), as part of the policy. The PKE became part of the insurance package. The PKE reads:

> This Policy shall not apply to any claim described below based upon, arising out of or attributable to any fact, circumstance, or situation of which, as of the respective date indicated below [July 27, 2018] any Insured had knowledge and reasonably could give rise to a "Claim" as that term is defined in the Followed Policy.

After Cantaloupe and Axis agreed on the new D&O policy, CFO Singh's and Controller Mundy's concerns continued persisted. They prepared an email and presentation to the Audit Committee summarizing their concerns with Cantaloupe's internal controls and how the company was handling the internal investigation regarding the issues Mr. Jones had raised. In their email to the Audit Committee, CFO Singh and Controller Mundy stated that the presentation "will enable the company to assess the root cause of these similar themed issues, and also help us be prepared

4

for a potential SEC investigation, in case Tom Jones' [sic] does decide to take the matters to the SEC." The presentation to the Audit Committee stated that contract revenue was "core to the company's business and the ability to effectively close the books and file the 10[K] according to the proposed deadline [was] now in jeopardy." Part of the concerns that Mr. Jones raised in May were related to the fact that he did not believe revenue was being accurately reported.

Cantaloupe disclosed to investors in an 8-K filing that there was an internal investigation of accounting issues and financial reporting on September 11, 2018. That same day, CEO Herbert, CFO Singh, and the company itself were sued in the first of three securities class action lawsuits. Those suits were eventually settled for an aggregate of approximately $15 million. Cantaloupe's other insurers, which did not have the same PKE provision, paid approximately $12.7 million of the settlements, and Cantaloupe itself paid approximately $2.6 million. Excess carrier Axis declined to provide coverage because of the PKE. Shareholder derivative demands then began in October 2018, alleging many of the same issues. Those claims eventually settled for $500,000; Axis again declined coverage, invoking the PKE. Finally, the SEC began an investigation in February 2019 and Hudson Executive Capital, a major shareholder of Cantaloupe stock, sued the company; Axis again declined coverage. Hence this suit.

## LEGAL STANDARD

A party prevails on summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). "A fact is material if it might affect the outcome of the suit under the governing law," *S.H. v. Lower Merion Sch. Dist.*, 729 F.3d 248, 256 (3d Cir. 2013) (citing *Scheidemantle v. Slippery*

5

*Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 538 (3d Cir. 2006)), and a dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Thomas v. Cmty. Coll. of Philadelphia*, 553 F. Supp. 2d 511, 514 (E.D. Pa. 2008) (quoting *Anderson*, 477 U.S. at 248).

The parties agree that Pennsylvania law applies. "The interpretation of an insurance contract is a question of law that is properly decided by the court." *Reliance Ins. Co. v. Moessner*, 121 F.3d 895, 900 (3d Cir. 1997) (citing *Standard Venetian Blind Co. v. Am. Empire Ins. Co.*, 469 A.2d 563, 566 (1983)). Furthermore, "[w]hether a claim for insurance benefits is covered by a policy is a matter of law which may be decided on a summary judgment motion." *Petrovsky v. Allstate Fire & Casualty Ins. Co.*, 141 F. Supp. 3d 376, 381 (E.D. Pa. 2015) (citation omitted). But the court "should not weigh the evidence and determine the truth itself, but should instead determine whether there is a genuine issue for trial." *Doeblers' Pa. Hybrids, Inc. v. Doebler*, 442 F.3d 812, 820 (3d Cir. 2006).

## DISCUSSION

### I. Breach of Contract Claim

"To state a claim for breach of contract, Pennsylvania law requires a plaintiff to establish: (1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract, and (3) resultant damages." *Frank B. Fuhrer Wholesale Co. v. Millercoors LLC*, 602 F. App'x 888, 891 (3d Cir. 2015) (citing *Ware v. Rodale Press, Inc.*, 322 F.3d 218, 225 (3d Cir. 2003)).

#### A. <u>Whether the Language in the Prior Knowledge Exception is Ambiguous</u>

To determine if the contract provision is ambiguous, the court looks at the "questionable term or language in the context of the entire policy" to decide if there are multiple interpretations. *Reliance Ins. Co.*, 121 F.3d at 900. When the provision is ambiguous, it should be construed in

6

favor of the insured, but if the terms are clear and unambiguous, "the general rule in Pennsylvania is to give effect to the plain language of the agreement." *Id.* at 900-01.

Here, as quoted above, the language in the Prior Knowledge Exclusion reads:

> This Policy shall not apply to any claim described below based upon, arising out of or attributable to any fact, circumstance, or situation of which, as of the respective date indicated below [July 27, 2018] any Insured had knowledge and reasonably could give rise to a "Claim" as that term is defined in the Followed Policy.

Doc. No. 50-4, Ex. 1 at 17. Cantaloupe first argues that the clause is ambiguous in that the first sentence includes the word "claim" being lowercase instead of "Claim" as defined in the policy. "However, that does not necessarily mean that the term is ambiguous." *Whitford Land Transfer Co. v. Seneca Ins. Co.*, No. 08-CV-0071, 2008 WL 4792386, at *4 (E.D. Pa. Oct. 31, 2008). Claim is "one of the commonest terms in the law" and is "a demand for something as a right" in the context of coverage under an insurance policy. *Id.* (internal quotations and citations omitted). There is no reasonable dispute over its definition and meaning: for purposes of the PKE, a claim here would include a demand for payment, which is exactly what Cantaloupe is seeking.

Next, Cantaloupe argues that the language is ambiguous because it does not specify whose judgment to assess when determining whether a matter could reasonably give rise to a claim. But here, an objective standard applies. "Policies using language of 'reasonableness' to discuss what an insured must disclose to an insurer create an *objective* standard with which the insured must comply." *Pelagatti v. Minn. Lawyers Mut. Ins.*, No. 11-cv-7336, 2013 WL 3213796, at *5 (E.D. Pa. June 25, 2013) (emphasis added). For example, in *Coregis Ins. Co. v. Baratta & Fenerty, Ltd.*, the policy read that it would not apply "if any INSURED at the effective date knew or could have reasonably foreseen that such act . . . might be expected to be the basis of a CLAIM. . . ." 264 F.3d 302, 304 (3d Cir. 2001). The court then applied an objective test. *Id.* at 306-07. And as held in

7

*Pelagatti*, "courts have consistently interpreted clauses such as those in the [*Pelagatti*] Policy to impose an objective standard on the insured." *Pelagatti*, 2013 WL 3213796, at *6. Because the policy in Cantaloupe is similar to those in *Pelagatti* and *Coregis*, an objective standard applies in this case as well.

### B. Applying the *Selko* Test

Once it has been determined that the language is unambiguous, a district court applies the "hybrid subjective/objective" *Selko* test. *Pelagatti*, 2013 WL 3213796, at *6. Under this two-prong test, the court (1) determines that the insured knew of certain facts and then (2) must determine whether a reasonable person in the insured's position would have a basis to believe that a claim could arise. *See Selko v. Home Ins. Co.*, 139 F.3d 146, 152 (3d Cir. 1998). "Although the *Selko* test was first applied to professional liability insurance policies for attorneys, the Third Circuit and Pennsylvania courts have applied the *Selko* test to other professional liability insurance policies[,] including real estate brokers, professional investment advisors, and public officials." *Ironshore Specialty Ins. Co. v. Conemaugh Health Sys., Inc.*, No. 3:18-CV-153, 2022 WL 1540574, at *21 n.16 (W.D. Pa. May 16, 2022) (internal citations omitted); *see MDL Capital Mgmt., Inc. v. Fed. Ins. Co.*, No. 05-CV-1396, 2008 WL 2944890, at *12-13 (W.D. Pa. July 25, 2008). "The first part of the test requires the court to determine the insured's subjective knowledge of then-existing facts[.]" *Ironshore*, 2022 WL 1540574, at *21 (quotation omitted). Furthermore, "[t]he burden is on the insurer, 'to prove what particular facts were known to the insured, and that based upon such facts, a reasonable [insured] in the same position would have concluded that liability was possible.'" *Id.* (quoting *Selko*, 139 F.3d at 152).

Here, the Court first analyzes the subjective knowledge of Cantaloupe, largely by and through CFO Singh and Controller Mundy, at the time of entering the D&O insurance contract with Axis. There are several undisputed facts that suggest that Cantaloupe subjectively knew that

8

the surrounding circumstances at the end of July could lead to a claim against the company. For example, it is undisputed that Mr. Jones sent an email to CFO Singh and Controller Mundy on May 8, 2018 stating that he would not sign "the Q3 Certification document because" he was "not comfortable doing so." Doc. No. 33-1, Resp. to Statement of Undisputed Material Facts ¶ 9. CFO Singh then texted CEO Herbert on May 9, 2018 that she "started exploring UsC a little to see what it would mean [t]o restate 2017 if needed and there is something that I want to highlight." *Id.* ¶ 13. On June 29, 2018, Mr. Jones emailed CEO Herbert stating that he had been "effectively remove[d]" from his position in the company and asserted that this was because of the CEO's "drastic loss of confidence" in his work "in response to [his] refusal to sign the Q3 10Q disclosure on May 9th." *Id.* ¶ 20. In a July 9th email, Controller Mundy and CFO Singh stated that "revenue contracts outside of [Cantaloupe's] normal terms were not always being communicated to accounting for evaluation." Doc. No. 36-1, Ex. 12. On the other hand, they also told Mr. Jones that they "strenuously disagreed with [Mr. Jones's] characterization of any of [Cantaloupe's] actions as unethical or as misrepresentations. This is simply not the case and is rejected in its entirety." *Id.*

However, for all the electronic angst being exchanged, Cantaloupe officials repeatedly stated that they did not believe that these issues were material. For example, in the same July 9th email, Controller Mundy and CFO Singh repeatedly stated nonetheless that the different flagged concerns were "not material[,]" though they did caveat this language by stating that, for example, it was "not material *for the relevant period*" and that it was "not material *to Q3*." *Id.* (emphases added). Controller Mundy and CFO Singh then noted that some of these changes would be included in the SAB 99 analysis and that they would evaluate whether some of these issues would be pertinent from an accounting standpoint in Q4. *Id.*

9

Axis argues that the Court must decide as a matter of law whether an objectively reasonable insured would have expected a claim to arise when there is no material dispute of fact regarding the facts known to the insured. But that circumstance does not exist here because there is a genuine dispute of material fact concerning Cantaloupe's subjective knowledge at the time of accepting the D&O policy with the pertinent exclusion. On the one hand, Cantaloupe argues that its officials' subjective knowledge at the time concerned an investigation into alleged revenue reporting discrepancies that may have had no material impact on the company. On the other hand, Axis argues that these circumstances were just the very kind of irregular occurrence that the officers could have reasonably known could lead to a claim.

Both parties argue *ad infinitum* of the importance, or lack thereof, of *Ironshore* to the facts of this case. In *Ironshore*, a child was transported by medical air flight from one of Conemaugh's facilities to Houston, Texas in a manner that allegedly constituted medical malpractice. *Ironshore*, 2022 WL 1540574, at *4. The insurer there argued that it would not cover the medical malpractice case because the hospital was aware of facts that the hospital "knew or should have known" would give rise to a claim. *Id.* at *22. The court held that summary judgment was not proper because there were "genuine issues of material fact that call into question Conemaugh's subjective knowledge of relevant facts at the time it applied for the Ironshore Policy. . . ." *Id.* The fact pattern in *Ironshore* is instructive for purposes of summary judgment in this case.

However, although Axis argues *Ironshore* does not govern here (which, of course, it technically does not), Axis concedes that *Ironshore* concerned "a material dispute of fact regarding the *facts* that the hospital *subjectively* knew regarding the extent of the infant's injuries." That is exactly the situation here: a material dispute of facts regarding what Cantaloupe, by and through its officials, knew regarding the *extent* of the alleged fiscal issues at the time in question. As the

10

*Ironshore* court observed, "if a reasonable jury were to believe [Cantaloupe]'s purported subjective knowledge . . . the jury could also find that it would be unreasonable for [Cantaloupe] to report such an ordinary occurrence on an insurance application." *See Ironshore*, 2022 WL 1540574, at *22. That kind of consideration is useful here as well.

In sum, there is a genuine dispute regarding Cantaloupe's subjective knowledge at the time of accepting the D&O policy with the exclusion effective July 27, 2018. Both Axis and Cantaloupe have selected parts of the record that serve as evidence that Cantaloupe had subjective knowledge that this was an immaterial investigation or, instead, an irregular occurrence. Axis argues that various text messages demonstrate such subjective knowledge. However, the Court must resist weighing the credibility or weight of various text messages and emails taken out of context in order to decide summary judgment because it is not this Court's role to "weigh the evidence and determine the truth itself[.]" *Doebler*, 442 F.3d at 820. That role belongs to the jury.

Because the Court finds that there is a genuine dispute of material fact regarding Cantaloupe's subjective knowledge at the time it entered the D&O insurance contract with Axis, the Court need not evaluate the objective prong of the *Selko* test. Thus, the Court denies Axis's Motion for Summary Judgment on the breach of contract claim.[1]

## II. Bad Faith Claim

Under Pennsylvania law, a court may provide relief to a plaintiff "[i]n an action arising under an insurance policy, if the court finds that the insurer has acted in bad faith toward the insured." Pa. C.S.A. § 8371. Using "clear and convincing evidence," a plaintiff must satisfy a two-

---

[1] Axis also argues that Cantaloupe failed to apportion between covered and uncovered amounts based on what Cantaloupe paid in the various legal settlements. However, as Axis notes, part of the policy relates to the Prior Knowledge Exception and the fact that Axis will not pay for any claim arising out of pre-policy knowledge of an event that would reduce the underlying limit of insurance coverage. Because the jury will determine whether Cantaloupe officials had subjective knowledge that a suit could arise and thus whether the PKE would apply or not, this issue of damages will also be one for the jury to decide.

11

pronged test to find bad faith: "(1) that the insurer did not have a reasonable basis for denying benefits under the policy and (2) that the insurer knew or recklessly disregarded its lack of a reasonable basis in denying the claim." *Rancosky v. Washington Nat'l Ins. Co.*, 170 A.3d 364, 377 (Pa. 2017). Furthermore, though "proof of an insurer's motive of self-interest or ill-will" is *probative* under the second prong, it "is not a mandatory prerequisite to bad faith recovery." *Id.* at 377 (emphasis added). "At the summary judgment stage, the insured's burden in opposing a summary judgment motion brought by the insurer is 'commensurately high because the court must view the evidence presented in light of the substantive evidentiary burden at trial.'" *Nw. Mut. Life Ins. Co. v. Babayan*, 430 F.3d 121, 137 (3d Cir. 2005) (quoting *Kosierowski v. Allstate Ins. Co.*, 51 F. Supp. 2d 583, 588 (E.D. Pa. 1999)). Finally, "Pennsylvania law provides that it is not bad faith to conduct a thorough investigation into a questionable claim." *Id.* at 138 (citing *O'Donnell ex rel. Mitro v. Allstate Ins.*, 734 A.2d 901, 907-08 (Pa. Super. Ct. 1999)).

Here, Cantaloupe points to only one piece of evidence supporting its allegation of bad faith. In an October 17, 2018 email, a vice president in the department handling D&O Insurance claims at Axis vividly wrote that she looked at Cantaloupe's claim and called it a "DISASTER." The Axis employee then wrote, in full, with some animations: "They [Cantaloupe] launched an internal investigation into accounting issues and delayed filing their 10-K. They had a 15 day extension which they MISSED and got a notice from NASDAQ of lack of compliance (they have until Nov. 1 to issue a plan). HOWEVER, they announced this mess on September 11 and we bound this sh!t NEW on 7/27. We did not get a warranty but we added a prior knowledge exclusion (which I will look at now). Buckle up."

Axis, in contrast, points to two pieces of correspondences with Cantaloupe: one in January 2019 and one a year later in January 2020. In January 2019, Axis informed Cantaloupe that Axis's

investigation was ongoing and followed up with further questions. Axis did so in part because the 8-K filing "occurred just 46 days after [Cantaloupe] had doubled its existing insurance coverage. . . ." In its January 2020 correspondence, Axis included 12 pages detailing its rationale for not covering the claim, based on many of the factual details enumerated previously.

Cantaloupe has a "commensurately high" burden to prove bad faith at summary judgment. *Babayan*, 430 F.3d at 137. The first prong of the two-part test requires "that the insurer did not have a reasonable basis for denying benefits under the policy." *Rancosky*, 170 A.3d at 365. It is clear that Axis had a reasonable basis for denying the claim: the undisputed fact that reporting concerns had been raised to Cantaloupe's CEO, CFO, and Audit Committee. Furthermore, Cantaloupe has not drawn the Court's attention to any "clear and convincing" evidence demonstrating that Axis did *not* have a reasonable basis to deny its claim. Whether the exclusion actually foreclosed coverage is immaterial to the present issue: what matters is that Axis had a *reasonable basis* to deny the claim based on these facts, and no reasonable jury would find that this stated reason was not, at a minimum at that time, a rationable basis for denying the claim.

The second prong of the test requires "that the insurer knew or recklessly disregarded its lack of a reasonable basis in denying the claim." *Rancosky*, 170 A.3d at 377. Again, Cantaloupe has not pointed to any evidence that Axis "knew or recklessly disregarded" a lack of a reasonable basis. Viewed in the light most favorable to Cantaloupe, Cantaloupe does emphasize the "DISASTER" email. The vice president who wrote the email then wrote that Axis "added a prior knowledge exclusion[,]" which she would then "look at now." By conveying that she would look at the exclusion, the Cantaloupe official was taking reasonable steps to investigate the matter to determine whether Cantaloupe had a viable claim or whether the PKE excluded the claim. The email's details of the contemporaneous events driving Axis's investigation demonstrates Axis's

reasonable basis of denying the claim. These were the various issues plaguing Cantaloupe at the time. Even under the second prong, no reasonable jury could find that Axis acted in bad faith in the record. Thus, the Court grants summary judgment on Cantaloupe's bad faith claim (Count II).

## III. Breach of Implied Covenant of Good Faith and Fair Dealing

"Pennsylvania law does not recognize a separate breach of contractual duty of good faith and fair dealing where said claim is subsumed by a separately pled breach of contract claim." *Simmons v. Nationwide Mut. Fire Ins. Co.*, 788 F. Supp. 2d 404, 409 (W.D. Pa. 2011) (citations omitted). Cantaloupe avers in its complaint that "Pennsylvania law permits a plaintiff to 'bring a cause of action for breach of the contractual duty of good faith and fair dealing in the insurance context, permitting an insured to recover compensatory damages for an insurer's failure to act in good faith.'" Compl. ¶ 55 (quoting *Simmons*, 788 F. Supp. 2d at 409). But Cantaloupe omits the very next line of *Simmons* where the court held that "Pennsylvania law does not recognize a separate breach of contractual duty of good faith and fair dealing where said claim is subsumed by a separately pled breach of contract claim." *Simmons*, 788 F. Supp. 2d at 409.

Here, Cantaloupe alleges that Axis denied Cantaloupe the benefit of the parties' bargain and insurance contract. Cantaloupe then reiterates its claim that Axis acted in bad faith and that Axis's conduct "was intended to preclude CTLP from realizing the intended benefit of its bargain[,]" which Cantaloupe states "is independent of CTLP's claim for breach of contract." However, Cantaloupe has not pointed to any evidence supporting this argument, let alone any way in which this alleged behavior is "independent" of the breach of contract claim. Based on the evidence and extensive record that discovery yielded, Cantaloupe has not demonstrated how any reasonable jury could find the bad faith and breach of implied covenant of good faith claims to be independent from one another or any evidence of a breach of implied covenant of good faith on its own. Thus, the Court grants summary judgment on this final claim (Count III).

## CONCLUSION

Although Axis contends that Cantaloupe subjectively knew that a claim could arise, and indeed that a claim did arise, there remains enough of a genuine dispute of material fact as to whether Cantaloupe subjectively knew that the ongoing investigation could lead to a claim under its D&O insurance policy with Axis. Hindsight is said to be 20/20, and just because a claim *did* arise, it does not mean that officers at Cantaloupe subjectively knew at the end of July 2018 that one reasonably *could* arise as that rubric is used in this context. Cantaloupe's breach of contract claim survives; it is the province of the jury to determine who knew what, when, and to what degree.

BY THE COURT:

_____
GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE